We have two cases on this morning's docket. We trust that you all are familiar with our lighting system. My only reminder today will be that rebuttal time is intended for rebuttal only. And with that, we'll call Case 18-31121, Cenac v. Orkin. Mr. I'm going to apologize for your name.  Laperouse. Mr. Laperouse. Mr. Laperouse, before you—I'm interested in your argument, but I will be particularly interested in— I don't know about others here on the panel, but about the vapor barrier. What is it and how does it work? Sure. Would you like me to start and explain that? Well, start where you like. I'm not familiar with that. I don't know if it's a membrane or a substance or a treatment. So if you can at some point fill us in, I'd appreciate the edification. I will. Absolutely, Your Honor. Thank you. May it please the Court. Ted Laperouse on behalf of the appellants Christopher and Audra Cenac. This case is not a simple termite contract interpretation case as Orkin would have the Court believe. There are issues that take it well outside of the Four Corners Doctrine contract analysis. And there are extraordinary and distinct episodes of misrepresentations, negligence, and unscrupulous behavior on the part of a nationally branded giant who sells to its customers peace of mind and protection for their homes. There are also many issues of fact in dispute that if the trial court had drawn every inference in favor of the Cenacs, as it's required to do, obviously, it could never have dismissed the Cenac's claims on a motion for summary judgment. Summary judgment was not only inappropriate, but to me it's dangerous to the rule of law when you've got this many fact issues in dispute. And while it's not my intent to focus on facts, I will hit the vapor barrier, but I do want to focus on law. I do feel that certain facts are necessary to this proceeding. Prior to 2007, the Cenacs maintained a full repair guarantee policy with Orkin. And Orkin calls that full repair guarantee policy an OR guarantee or ownership repair guarantee. Is this the agreement that you all, that your clients inherited from the previous owners? That's correct. It's tab 1 in the materials that we gave to you. I'm not sure if you've got those. We do have them. Okay. So this is just a technical question, but is this a different address than the other address? It's kind of confusing. It was renumbered by the city. Okay. It was the same. But there's no dispute amongst the parties. No dispute. This is the right agreement. That's correct. So this is binding on the parties in addition to the later agreements? Yes, Your Honor. Yes, Your Honor. The ownership repair guarantee was very important to the Cenacs. This is Orkin's Cadillac policy, and the Cenacs home is valued at $2 million plus. It was very important for them to have this type of guarantee. And so when Orkin approached the Cenacs in 2007 and said, hey, we'd like to add Formosan coverage to your existing OR guarantee, because right now it only covers subterranean termites, the Cenacs said, great, let's do it. And they actually added coverage to their barn and to their house and paid Orkin for that coverage. And in doing so, Orkin presented them with two different Orkin-drafted, confusing and muddled agreement forms. And the Cenacs signed those agreements thinking that, as Orkin was telling them, they would have now Formosan coverage added to their OR policy. I take it one of the key issues is this 91 agreement says ownership repair guarantee. Correct. The OR you're referring to. Yes, sir. As well as the treatment. And you all think that there's ownership repair guarantee in your later agreements. Yes, Your Honor. Where is that language that you would draw our attention to? So I would draw your attention to two issues. First of all, handwritten through the boilerplate terms, subsequent to whenever these boilerplate terms were drafted, there is the words add on to original account 588129. And it actually should have said 5888129. But to the Cenacs, that is an important designation, written through the middle of the agreement, because that to them represents their intent, that Formosan coverage was being added to their original account, the OR account. Didn't that number just identify the house? It's not referred to on the contract. It's not a contract number or anything. Isn't that just the house that they were insuring? It is the policy number that is issued. Well, I don't see it on the policy. Yes, sir. So if you would take a look at tab 4. Tab 4 actually is a termite inspection report that contains the number 588129. But why is that inconsistent with it just being identifying the house? Well, because it's a policy. Because it's our belief it's a policy. The 588129 number was included on the inspection report from 2002 when it was still owned by Mr. Eshte, and then later that same number applies to the Cenacs policy. Is your point that that number signifies an OR policy? Absolutely. As opposed to just an account number? Absolutely. It signifies the add-on. The handwritten language says add-on to original account number. I see that, but it says account number. And so what I'm trying to do is understand your argument as to why just reciting that number signifies a rather expensive undertaking by ORCIN. Sure. The language is all taken together. Your Honor, no one knows what add-on to original account means. Isn't that a problem? No one knows. To the Cenacs, it means that their foremost coverage was added to their OR policy. Well, wouldn't a natural way to do that be to put the contract number that had previously covered the property rather than just putting that number, which to me means the house or the account, the old Cenac account? Sure. They could have done that. These are ORCIN's forms, Your Honor. What the Cenacs know is they were being told at the time by the salesman, yeah, we're going to add foremost in coverage to your existing repair guarantee. You're going to be covered for all types of termites here. And they wrote that through the middle. And then years later, year after year after year, they give them termite inspection reports that say you indeed have an OR guarantee. They don't say who you are. So your argument is that the original agreement was incorporated by reference and that this is simply a supplement to the original contract. That's what the Cenacs believe. All of the provisions of the subterranean coverage would apply now to foremost. Yes, Your Honor. That's correct. How is that consistent with the integration clause in the foremost contract? Sure. First of all, Your Honor, when you've got ambiguities in the contract, which you not only have the handwritten one, you have the two typewritten ones, which one of them says, you know, with the sole exception of any claim for termite damage repairs, customer waives any claim in any lawsuit. Then it also says customer acknowledges that ORCIN is performing a service and waives any claim except termite damage repairs as set out above. With the language modifying the original boilerplate, it's the Cenacs position that now foremost in coverage, this is what they were told, now foremost in coverage is added to your original account. And ORCIN continued to let the Cenacs believe that for many years later by issuing those inspection reports confirming that they had an OR guarantee. The CPP form that you're talking about, continuous protection plan form, is designated as a U1. That's ORCIN's coding system. They never told the Cenacs, you have a U1 or you have an LC, which is a retreatment only. Year after year after year, they said, you have an OR guarantee. And the Cenacs relied on that in paying them every year. And where is that? Where are these annual references to OR? If you would look at tab 5, Your Honor, that's just one example of the many inspection reports that were given. You can see in 2012 ORCIN was representing to them that they had an OR type guarantee. Where? It's on the top right, Your Honor. If you see a third line down, guarantee type OR. And that was just one of several of these that were given to them year after year. What here makes clear that this covers Formosan? Because this could just simply be a reference to the 91. Well, OR refers to ownership repair guarantee. Which everybody agrees you have under the 91 agreement. It doesn't say OR guarantee except for Formosan termite. Well, it says subterranean, though, doesn't it, on this very exhibit, number 5? Am I missing the Formosan reference? It says it down at the bottom. Excuse me. Let me pull that up. It says, if you look down in the box below where we're on exhibit 5, Formosan coverage and add-on. Okay. Okay? And it says OR, Formosan coverage and add-on. How in the world? You know, Louisiana Civil Code Article 2056 says documents, standardized form documents, must be interpreted against the party who furnished the text. You know, on top of all of this, Your Honors, there's no certainty that the CPP form even is the form that applies to the House. Many of ORCN's employees, including their service manager, testified that the special services agreement form, which is the tab 3, was the form that they routinely used to add termite coverage, Formosan coverage to policies where it wasn't on there before. And all of these issues, Your Honors, bring up the fact that the Sinatics were told one thing. ORCN supplied these confusing, ambiguous documents that require outside evidence for their intent to be understood. Why, if you just take the CCP contract as an integrated agreement, unless you can get parole evidence in, why isn't that the entire contract? Because once the words were modified, the only person that can determine what that means. What was modified? The CPP form. When ORCN wrote, add on to original contract through the middle of that document, never mind the other confusing terms in there about damage repairs being excluded. But when they wrote through the middle, the only person, because the Sinatics believe that means, okay, now I've got Formosan coverage for my ORR guarantee. The only person that can make that determination on what that means is a jury. Because there's no way to interpret that other than it could mean several different things. Okay. You've got five minutes left. Do you want to pivot to your tort theory? Yes, Your Honor. Thank you. So the court completely disregarded the Sinatics' claims in negligence. And it basically said that all of the Sinatics' claims arose out of their contract. But that's not the case. It can't be said that any of these muddled contracts contain any agreement or obligation on the part of ORCN to serve as an engineer and specify how and the manner and where this vapor barrier was supposed to be attached to the house. The issue with the vapor barrier is it's like a bisque clean layer. That ORCN instructed them to attach to the underside of the house to prevent moisture from hurting the wood. What it did, though, was it actually created the opposite effect. And it served as like a sauna that attracted moisture and attracted termites. And it's undisputed that that vapor barrier actually caused a lot of the termite damage in this case. What evidence is there of that? Well, no one disputes it. It's undisputed that the vapor barrier in whole or in part caused the termite infestation. Yes, Your Honor. Well, we'll hear from counsel. I'm not so sure they agree with that. But with regard to the vapor barrier, did ORCN instruct how it was to be installed and whom they should hire to install it? They didn't suggest whom they should hire. They told them how to do it and where to do it. And it's my argument. Did they approve it after it was installed? They did. They sent a letter. They sent a letter after thanking the Cenax for taking those measures. Is there evidence in the record that they inspected the barrier after it was installed? My clients testified that they did, that they came out. They sent a letter thanking them for doing it. The letter is not in the record, though, is it? I believe it is, Your Honor. I believe it is. I didn't find it. Okay. I believe it is. But I can check on that. And this is a negligence theory, is that right? It's a negligence theory. But where do you get a duty? Because ORCN is obviously contracting to do various things. It's not contracting to do this. Is there a Louisiana case that you can cite that suggests there's a duty here? Well, when ORCN assumed the role of a design professional and told them how and where to install this vapor barrier, it assumed a delictual or tort duty. And what's your best case for that proposition? Your Honor, there are several. There's the Dubin case. There's a case by this own circuit, the Huggs case from 1989, that states in Louisiana when one acts negligently in performing its contract, they commit both an active breach of contract and active negligence. Your Honor, also, I want to mention this while my time is up. Let me ask you one other thing. There are all kinds of release language in this contract, assuming it applies. So why does the contract not release ORCN from a negligence claim? I would argue, number one, Your Honor, that language, a jury needs to determine what exclusionary language now applies after the ambiguity of the contract. Second of all, we don't have that in the special services agreement, which could have been the one that applied to the House. But I would argue, to answer even further, the trial court ignored the gross negligence claim. In Louisiana, as you know, you cannot negotiate away or disclaim liability for gross negligence. That's Louisiana Civil Code Article 2004. And we have several events of recklessness and tortious disregard that if the jury finds that rose to a level of gross negligence, the syntax would be entitled to recover their provable damages. Your Honor, I'm almost out of time, so I want to thank you for your time. There are several episodes of bad faith on the part of ORCN, one of which, the most egregious, we think, is when they actually denied even having a contract with us after they discovered that there's going to be millions of dollars in repair costs. Thank you. You've reserved two minutes for rebuttal. Thank you. Mr. Urquhart. Good morning, Your Honors. Quentin F. Urquhart, Jr. on behalf of ORCN Exterminating Company. Contrary to what counsel just presented to you, this case presents a very simple and straightforward question. Did ORCN ever contract to repair Formosan termite damage in the Sennac home? The answer to that is no. The obligation ORCN undertook was very narrow, wasn't it, to inspect and treat? That is correct, Your Honor. Right from the beginning in 1991, ORCN validly restricted the obligations which it undertook at this property. In 1991, it agreed to cover the property only for native subterranean termites. And I've been doing this work now for many, many years, and there's two main distinctions in termite treatment contracts that are at the heart of everything. The first is the distinction between a retreatment contract and a repair contract. The second distinction is between native subterranean termites and Formosan termites. Both of those distinctions go to the heart of the three contracts that are at issue in this case. That 1991 contract, the original agreement, expressly said that it did not cover Formosan termites in three different places. Before we get to the Formosans, let's be clear. In the 1991 contract, you just made a distinction. Is the OR guarantee, what does that guarantee with regard to subterraneans back at the first contract? Sure, Judge. Is that also repair? He says OR means to repair. Judge, if you read the language of the OR repair guarantee that was issued in 1991, it specifically says that while that person owns the home, ORCN will agree to repair any subterranean termite, any native subterranean termite damage that occurs. And it specifically says will not cover Formosan termites. It further said, although this really isn't an issue, this is before the court, but I want to make sure it's clear, that that repair guarantee only went with the existing owner. If the contract was transferred to a new owner more than a year after the original treatment date, the repair guarantee did not go. So when Dr. Sinak purchased this property in 2003, 12 years after ORCN originally treated it, if he had looked and said, oh, OR, what does that mean, and he had pulled out that agreement, he would have seen right away it didn't cover Formosans, and it doesn't cover repairs for me for subterraneans because I'm assuming this contract 12 years later. But you're not denying, though, just to be clear, you're not denying that the OR, whatever the OR covers, it continues to cover the Sinaks? Correct. It continues to cover the Sinaks. We are never denying, Judge, that they didn't get a contract. They always had a contract on this property. Our position is they have never had a contract under which ORCN agreed to repair Formosan termite damage, ever. That's our position. Well, they did after 1971, though, of course. No, no, Formosan termite damage, Your Honor. Didn't get to repair it, huh? Correct. They have never, ORCN has never undertook, undertaken, excuse me, an obligation to repair Formosan termite damage at this property. That's exactly what Judge Zaney found. But they're not just suing you in breach of contract, right? They're also suing you under unfair trade practices. That is correct, Your Honor, and I'm happy to address those assertions as well. Please do, because as I understand their narrative, it's essentially that you had these contracts that were either didn't cover or at least were kind of hard to follow, and I get that they're certainly not explicit as to what they want, but they're saying they're also telling you that your representatives were telling them verbally, oh, don't worry, this is going to cover Formosan. Why should that question not go to a jury? Well, because, Your Honor, that's not what the Louisiana Unfair Trade Practices Act was all about. The Louisiana Unfair Trade Practices Act, as this Court is aware, is called a Junior FTC Act. It's meant primarily to address pervasive and ongoing trade practices and conduct by companies that are anti-competitive and anti-consumer. When you have a simple, straightforward, private contract case where one party agrees to do certain things and the other party says, no, you agreed to do something else, that is a contract dispute. And this Court has held— I think they're arguing deception, though. What's that now? They're alleging essentially fraud, right, that you all promised one thing, but the contracts only said something else. Correct. I take it that Louisiana UPTA, UTPA covers fraud? It would cover fraud if it fell within the scope of the Act, Your Honor. But here, if what they're saying is correct, it would turn every single breach of contract case into a Louisiana Unfair Trade Practices Act case because all that a person would need to say is, you know what, they defrauded me. And if that's all it took, we'd see, luck to our cases, every single time someone sued a breach of contract. And we don't. And that's because these—there's a very, very narrow cause of action. As this Court said in the, I believe, Turner case, Turner v. Purina-Mills, the statute does not provide an alternative remedy for simple breaches of contract. There is a great deal of daylight between a breach of contract claim and the egregious behavior the statute prescribes. In this case, you've got a simple contract dispute. Anyone can try to characterize that contract dispute as fraudulent or misleading or deceptive, but just because they try to characterize it that way doesn't bring it within the ambit of LUPTA. Under what provision of the contract was Orkin acting in recommending a vapor barrier? Absolutely, Judge. If Your Honor looks at page 2 of the original 1991 agreement, on page 2 of that agreement, on the reverse side, and I will tell Your Honor exactly which paragraph number that you should look at, it's paragraph number 2. It says here in part— Tell me again where you're looking. Sure, Judge. This is in the 1991 agreement. That's going to be on page 2 of it, paragraph number 2. And it says, I understand that structural or mechanical problems which result in water leakage inside my building or through the roof or outside walls of my building may destroy the effectiveness of Orkin's treatment, and this could allow termites to continue to exist in my building. If such a condition is discovered, and that's discovered by Orkin, I will be responsible at my own expense for making the repairs necessary to correct the structural or mechanical problem, and after I make the repairs, Orkin will treat my building again to control the infestation. So what every pest control operator in the State of Louisiana is required to do, Judge, each year is go out and inspect. They go out and inspect. But is that a question of Orkin just discovering it? Orkin says, here's what you need to do to correct the problem. Correct. Well, Judge, I think it would be, I don't know if absurd is too strong a word, but absurd for a pest control operator to go out and say, you know what, you have a moisture problem there. I can't tell you what to do about it. Orkin said, you need to put a moisture barrier up. That's what you do in order to reduce moisture underneath the property. Orkin did not design that moisture barrier. Orkin told them they needed to get one put up. They hired the contractor to do it. Orkin later observed that they had put one up. The problem with the moisture barrier that they put up was whoever put it up, they didn't put it up in a way to allow the home to breathe, and that's why there was moisture damage which occurred. What about the June 18, 2013, letter? I believe it was Bates Marked CNAC 150. I think it's attached to the deposition, but I don't know if that's in the record. But Orkin responds to the installation of the vapor barrier. Why is that not? Let me back up one step over. Why is it not, if you're saying it's rooted in the contract and Orkin's advice to put the vapor barrier in wound up being faulty or could possibly have been faulty, why is that not a valid allegation of a breach of the contract? In other words, now we're back to breach of contract as opposed to a tort theory. Well, because Orkin didn't breach his contract by making a recommendation. There's no one, not even their own expert, would suggest that this home didn't need to reduce the moisture that was underneath it. Because of the way they added on to the home, they cut off the natural circulation that existed to keep the home dry. But did they not approve the installation, this June 18, 2013, letter? They never approved the installation, Your Honor. They observed that it had been done. Well, they said thank you for making all these corrections that we recommended. Isn't that approving it? Well, Judge, I wouldn't call it approving it because all Orkin saw was that they had put it up. Orkin's not, as I would agree with Mr. Laparuse on this, Orkin is not an expert in moisture barrier installation. You have to hire the correct person to do that to ensure that the property does ventilate correctly. Okay, but as I understand it, you want us to stick to this CCP contract. And I don't see in here anywhere, maybe I missed it, that it's Orkin's duty to discover problems where moisture is getting into the house. You talked about repairmen doing it, but that's not in the contract. I mean, you know, Orkin relies strongly on the limited obligations it had to treat and inspect. So, I mean, you can't have it both ways. No, I understand that, Your Honor. And what Orkin does is, within their scope of expertise, is they go out and they inspect the property annually. The state of Louisiana requires them to do that as part of their obligations. Well, I understand inspect, but I don't see discover in the contract, and I don't see recommend. It's directly, Your Honor, I'm sorry, it's directly in the 1991 contract. Well, wait a minute, you say that is totally irrelevant. Well, no, I'm not saying it's totally irrelevant. I understand your position to be that the 07 contract superseded and replaced the 91 contract that had nothing to do with Formosan contract termites. No, Judge, that's really not what I'm saying. So you say both of them apply? Let me go back, though, and make sure the Court understands what the plaintiffs are saying. The plaintiffs are trying to turn the 1991 contract, not the 2007 CPP. They're trying to turn the 1991 contract into a repair guarantee. That 1991 contract directly stated that Orkin was going to discover and report problems of moisture underneath the property, and if they did discover them, the homeowner needed to repair them. So you rely on that language in the 91 contract? I do, Your Honor. Well, how do you do that when the 07 contract says it's an integrated contract? Is it 91 or 99, not contract? The 1991 was the original. The 91 contract has in bold print all over the contract, this has nothing to do with Formosan contract termites. So, I mean, I don't see how you can claim on the one hand that the 07 contract is an integrated contract and that governs the rights of the parties, but this other contract that says all over it that it has nothing to do with Formosan contract somehow applies. You can't cherry-pick out of the contract. No, Judge, I'm not trying to cherry-pick, but they have to pick sort of their poison here. So which contract are they trying to recover under? If they're trying to recover under the 1991 contract, it clearly says it does not cover Formosan termites. If they want to try and amend it to add Formosan coverage, then they need to live with the rest of what the contract says. Okay? Well, it seems to me if you go in with a brand-new contract and you say this provides for Formosan termite protection, the 91 contract says it doesn't, you've got a new contract. I agree, and I'm happy to go with the 2007 contract if you take that by itself. And under that 2007 contract, it clearly says in multiple places that this is a retreatment-only guarantee. It is not a repair guarantee, and the homeowner waives any claim at all against ORCA. Let me bring up one other thing that's, I think, critical about that 2007 contract, and this is something they would love to ignore. It's not even addressed really by them in their briefing. In that 2007 contract, they love to say, well, there's an ambiguity created because this limitation of liability clause refers to the possibility of termite repairs. Well, Judge Zaney disposed of that quite easily. He said, look, there is no termite repair set forth above, so it doesn't add anything. The critical part of that limitation of liability clause, though, follows later. It says that if you are making a claim, if there is any claim for termite damage repairs, then your damages are limited to the amount that has been paid under the terms and conditions of the contract. That's the total that you're allowed to recover. And Judge Zaney pointed out they've already received many multiples of that already from ORCA, so they don't have a right to recover anything more under the provisions of the agreement. They just get their money back, is what you're saying? Correct, and they've already gotten many times more than their money back, Your Honor. Let me ask you. Go ahead, Judge. Let's talk about the TORC claim a minute. Sure. The provision in the contract that says, let's see, it's on the first page of the CCP contract, I don't know, about 12 lines down. First it sets out ORCA's responsibilities to treat, and then it goes on down and says, customer agrees to maintain the treated structure free from any condition conducive to termite infestation. And then it goes on including a whole bunch of things, including moisture, improper ventilation, et cetera. So I take that as a disclaimer by ORCA that they have any obligation to do that. Now, why is that not a – why are you not placing that obligation on the customer instead of assuming it's yourself? That is a great question, Your Honor, and the reason is that for the purposes of the motion for a summary judgment that we filed, we didn't need to allege that and plead that at that time. But certainly if this case were to have gone to trial, that would have been front and center of one of the things that we would have alleged if they claimed that this agreement, the 2007 agreement, is the one that applies to the home. But we probably don't even need to get to that, Judge, in some ways. But I agree with your interpretation completely because that agreement says it's retreatment only. So you don't even need to spend the time fighting with that because it's a retreatment only guarantee. Okay. Now, getting to the tort case, we have a number of Louisiana cases, including a Supreme Court case, Dufresne, where an employer's employee driving his own car was involved in an accident, and so the party who's injured sues the employer. The employer's carrier denies coverage because he doesn't have non-owned auto coverage. And so the insured, the employer, then sues his agent and says, You didn't provide me with the coverage that I requested. I requested all possible coverage. And so the issue was whether there was a contract statute of limitations or the tort statute of limitations. And so the court said because there was no specific obligation on the part of the agent to provide non-owned auto insurance, it's not a breach of contract. It's a tort case. So the one-year tort statute of limitations applies. Now, why doesn't that apply here? If Orkin hasn't affirmatively assumed any obligation to maintain, to discover conditions that would be conducive to moisture and then went further and disclaimed that it was their responsibility and put it on the customer, why isn't that analogous to that case? There's no specific assumption of Orkin of the obligation to do the thing that the plaintiff is alleging was done negligently by Orkin. Judge, I would have to go back. I vaguely recall the case that you're referring to, and I have to go back and look at it specifically. Well, I mean there are a number of cases that do that. But the basic proposition I understand. And I guess that my answer to you on that would be that simply courts have drawn the distinction between duties that arise from contract and duties that arise from tort. And we specifically pointed out in our brief a case called Duke, D-U-C, versus Orkin, that brought up exactly this issue of whether a negligence claim could be asserted against a pest control contractor outside of what the contract said. The court in that case found no, you cannot maintain a tort claim. You cannot convert what is a breach of contract claim into a tort claim. Yeah, but wasn't that case one where they said a negligent treatment of something that Orkin was doing under the contract? Correct. Okay. Which is exactly what they're alleging here. No, no, no. They're alleging here that you, that Orkin assumed an obligation that they didn't have in the contract, that is to give advice and recommendations on how to prevent moisture and that instead of doing good did harm. Well, Judge, I mean, again, I would say that all that Orkin did, and it was obligated to do, was point out to the customer what they needed to do to correct a moisture condition, which was something that any pest control operator should do. They should let you know what you need to do in order to fix it. Well, you don't put that in the contract. Well, Judge, it is in the 1991 contract. I will concede to you, because I read it again this morning myself, that there is not specific language in the 2007 continuous protection plan contract that says that. But, again, remember, the plaintiffs are saying that contract isn't the one that applies. Well, I'm trying to get your position. I understand that. I understand that. And, Judge, I concede that the 2007 contract doesn't have the same language that the 1991 contract has about the discovery of termite infestation. To wrap up. Let me just ask you one thing about the special service agreement. We had a 30-day special service agreement. What is that all about? Yes, Judge. So what a special service agreement does, it's kind of called an odd job agreement or a one-time agreement. It's meant to do a single one-time treatment of a particular piece of property. It's used often for detached structures like sheds by the company that aren't going to be put under a continuous protection plan. So they do a one-time treatment. They say, look, if you have a problem within 30 days, we'll come back out. But we aren't giving you any guarantee. We are giving you any repair obligation, any retreatment obligation in this. So that only applied to the barn? Our position was that applied to the barn. Their position is somehow that amended the 1991 contract. The problem with that argument is you can't amend the 1991 contract because of the integration clause that Your Honor referred to, which says to amend it you've got to have something in writing signed by a corporate officer of Oregon. They don't have that. They have nothing with that. Counselor, to be clear, you do not agree, Oregon does not agree that any shortcomings in the vapor barrier installation have anything to do with formosan termite damage in this house? They have to do with creating a condition conducive to formosan termites. And the reason I was shaking my head when Your Honor observed me before was I wanted to make sure that distinction is made clear.  A vapor barrier can create a moisture condition and termites like moisture. So one goes before the other. And when Oregon, this wasn't mentioned, when Oregon went back out subsequent to when they first saw the vapor barrier being put up and saw that it was holding water, what did they do? They immediately told them you need to take that down. So they would have said, well, wait a minute, that's not an obligation you undertook. We don't want you to tell us that. Of course they wanted us to tell them that, to get that water out of there, because it's conducive to termites. So we took on the obligation of inspecting it each year. When we saw that the moisture barrier in the way that their contractor had installed it was creating a problem, we immediately brought it to their attention. Well, not immediately. I mean, it was, what, a year after? Well, let's see. The letter was written in April or June. Correct, Your Honor. And April is when the barrier was put in, I think. Yeah, but when I said immediately, Judge, I meant immediately after we saw the water gathering underneath it. We told them about that. We sent them a letter telling them about the fact you've got water being held there. I didn't see the letter. Is that in the record? It should be in the record, Your Honor, and we'll be happy to. Well, it was certainly after June when he wrote the letter. Correct. And so my point is when we go back out as a pest control operator, we find things like that, and we point them out to the homeowner and said, look, you need to get your vapor barrier installer back out there again to fix this to make sure it's installed correctly. So you understand that sometimes litigant cases say when you volunteer something to do something outside of the contract, you may expose yourself to court liability. I understand that, Judge, but I would, I guess, analogize it to if I saw that you had a low, that your tire was low on your vehicle, and I said to you, you need to go have that checked, and you brought it to a repair shop, and they negligently repaired your tire. I'm not liable for that just because I pointed it out to you. That's the same thing here. The letter doesn't certify that it was installed properly. No, it doesn't, Judge. And you're not there coming back every month. No, once a year. Anything else? Thank you, Judge. We have your argument. Thank you very much. Let's give counsel another two minutes. Thank you. Yes, sir. First of all, I want to respond on the LUPTA issues. There's a Fidelic case which has been cited. A LUPTA claim should not be dismissed unless it is clear that nothing unfair occurred. The court in that case expressly stated that it was, it applied to, LUPTA applied to companies that regularly did business and where there was an unbalanced bargaining position. That's what we have here. This case clearly fits, especially based on, and I could go through the numerous unscrupulous behavior and deceptive behavior on the part of Orkin if you want me to, and talk about the eight or ten points that we've got on that. I want to also say that, you know, with respect to the CPP form, Mr. Earphardt actually just admitted that that form is ambiguous because he read on the limitation of liability clause where it actually says, well, in the case of termite damage repair claims, it's limited. How in the world? These are Orkin's forms. Louisiana Civil Code Article 2056 is clear that when they're standard form agreements, they've got to be interpreted against the person that furnishes them. What do you make of the language that I'm about to read, which strikes me as not at all ambiguous? Customer agrees that under no circumstances shall Orkin be held liable for any amount greater than the amount paid by the customer to Orkin. I say that once they wrote through the terms, add on to original account, that it became unclear what any of that means, and a jury needs to determine what the contract now means because the syntax understood it to mean— This language wasn't struck. It's still there. Well, it was struck—it was not struck, but on the first page of that agreement. I know. Add on to original account. So my position is— That means add this agreement to the account, the entire agreement. Well, what the syntax understood it meant was they were getting foremost in coverage added to their original O.R. repair guarantee. That's what they were told by Orkin at the time. What did they think the contract was that they signed? Well, Your Honor, I mean, look, we have people that, you know, do things all the time and sign forms. They read through the forms later. It wasn't—they testified that it wasn't—you know, they were being told at the time this is what we're doing for you. They looked—there was an SSA form. There was a CPP form. They trusted Orkin. You know, they had Orkin for years. You're going to have trouble finding cases where courts have said you don't have to worry about what you sign. Well, that's correct, except in the case where they did. They wrote through the middle saying add on to the original. Plus you've got this other typewritten language that's ambiguous in there. They also—you know, Orkin's own employees testified that the SSA form was routinely used to add foremost coverage to policies that did not have it. It is not a congruent form with either the SHED or the BAR. Because, you know, it's—there's the case law in Cascio v. Shuriak. It's well-settled Louisiana jurisprudence that you—a court cannot construe a contract in a manner that's going to lead to absurd consequences. There's nothing more absurd to think that back in 2007 the SNACs were going to pay nearly $2,000 for some 30-day treatment. Again, no one from Orkin—they have no witness that can say what agreement went with this contract. What's absurd about the client's clearly very unhappy with what happened, so the company gives all your money back? Well, because they— Nothing absurd about that, right? It's a money-back guarantee. Well, that's not what this was. This was a repair guarantee, according to the SNACs. They were told it was a repair guarantee. Thank you. We have your argument. Thank you. Case is submitted. Thank you. We will call up the next case shortly.